# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Missouri

In the Matter of the Seizure of )
One 2021 Ram Promaster Van, VIN: )
3C6LRVBG7ME512286 )  Case No. 4:25MJ2062 JSD
)
)
)

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Craig Schneider, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that there is now certain property namely

One 2021 Ram Promaster Van, VIN: 3C6LRVBG7ME512286

which is

subject to forfeiture under Title 18, United States Code, Sections 981(a)(1) and 982(a)(1) and Title 28, United States Code, Section 2461, and therefore, is subject to seizure under Title 18, United States Code, Sections 981(b)& 982(b) and Title 21, United States Code, Sections 853(e)&(f) concerning violations of Title 18, United States Code, Sections 1343, 1956 and 1957.

The facts to support a finding of Probable Cause for issuance of a Search and Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

Continued on the attached sheet and made a part hereof.      X   Yes ___ No

_____
Signature of Affiant, Special Agent Craig Schneider

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41

February 27, 2025                                at   St. Louis, Missouri
**Date and Time Issued**                              **City and State**

Honorable Joseph S. Dueker, U.S. Magistrate Judge     _____
**Name and Title of Judicial Officer**                **Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

I, Craig Schneider, am a Special Agent with the Federal Bureau of Investigation being duly sworn, depose and state as follows:

### INTRODUCTION AND BACKGROUND

1. I have been so employed as a special agent of the FBI since March 2018. I am assigned to the St. Louis, Missouri field office where I work on a complex financial crimes squad. Prior to becoming a special agent with the FBI, I received a Master of Business Administration degree with an emphasis in finance and worked as a credit risk analyst and approval officer at a global financial institution. Since joining the FBI, I have participated in numerous financial crime investigations, including bank fraud, corporate fraud, Ponzi schemes, securities fraud, and business email compromise investigations. I am responsible for, among other assignments, conducting investigation of alleged criminal violations of title 18, United States Code, Sections 1343 (wire fraud), 1956, and 1957 (money laundering).

2. I have personally participated in investigations involving the violations of federal law regarding mail fraud, wire fraud and other federal violations such as money laundering that result from such unlawful activity. I have personally participated in the execution of search warrants and seizure warrants, involving the search for various types of evidence and property. As a federal agent, I am authorized to investigate violations of the laws of the United States and to seek forfeiture of property under the authority of the United States.

3. Since approximately January 2023, the Internal Revenue Service-Criminal Investigation and the U.S. Food & Drug Administration, and later joined by the FBI, ("investigating agencies") have been investigating a wire fraud and money laundering scheme involving Diarra Williams ("WILLIAMS" or "Defendant Williams"), the owner of The Bailey

Foundation ("TBF") and Nicholas Warford ("WARFORD" or "Defendant Warford"), the owner of Warford's Classic Foods ("W.C.C."). The investigating agencies have been investigating a fraud scheme involving WILLIAMS, WARFORD and others, known and unknown, and several associated entities as described throughout this affidavit, for violations: of wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1957), and conspiracy to commit violations of wire fraud, and money laundering (18 U.S.C. §§ 371, 1349, 1956(h)), (collectively referred to hereinafter as the "Subject Offenses") by and through a scheme to defraud and obtain funds under the purview of the U.S. Department of Agriculture (USDA).

4. A grand jury sitting in the Eastern District of Missouri returned a ten-count indictment against WILLIAMS and WARFORD on February 26, 2025. The indictment charges WILLIAMS and WARFORD with one count of Wire Fraud Conspiracy, seven counts of Wire Fraud, one count of Money Laundering Conspiracy, and one count of Obstruction of Justice, in connection with their scheme to defraud the State of Missouri.

5. Based on the results of this investigation, there is probable cause to believe that between approximately November of 2018, and February of 2025, WILLIAMS and WARFORD, through their entities, TBF and W.C.C., whether individually or in conspiracy with others, fraudulently obtained in excess of $7 million, through such scheme, some of which was transferred between various financial accounts and then used to purchase two 2021 Ram Promaster Vans, VINs 3C6LRVBG7ME512286 and 3C6LRVBG9ME512287, a 2019 Ram 1500, VIN 1C6SRFLT5KN784521, and a 2017 Chrysler Pacifica, VIN 2C4RC1GG3HR811929, in violation of Title 18, United States Code, Section 1957. As such, the property described in Attachment A are subject to civil and criminal forfeiture.

6. This affidavit does not contain all of the information known to me in regard to the

investigation; however, it contains enough information to establish probable cause to authorize the seizure of the property described in Attachment A.

## MISSOURI'S FOOD AND NUTRITION PROGRAMS FOR CHILDREN

7. The State of Missouri, through its Department of Health and Senior Services ("Missouri DHSS"), administered food and nutrition programs designed to provide nutritious meals to low-income Missouri children. To fulfill the mission of feeding low-income Missouri children, Missouri DHSS administered two programs: **(1)** the At-Risk, Afterschool Child Food Program, and **(2)** the Summer Food Service Program (collectively "Missouri's Food and Nutrition Programs for Children"). Both programs are funded by the United States Department of Agriculture. Missouri's Food and Nutrition Programs for Children provided funds for meals served to low-income, school-age students after school and during the summer, when school was not in session. The meals were served by schools and community-based, nonprofit organizations at hundreds of locations throughout Missouri.

8. Through Missouri's Food and Nutrition Programs for Children, Missouri DHSS paid reimbursements to nonprofits that provided qualifying meals to low-income children in Missouri. To qualify for those state meal reimbursements, nonprofits—like T.B.F.—had to truthfully represent in their reimbursement claims that qualifying meals were provided to low-income Missouri children. For a meal to be reimbursable under both programs, the meal had to include several specific items, including an eight-ounce serving of fluid, white milk, a meat, a vegetable, a fruit, and a grain.

9. As another requirement to receive reimbursements from Missouri's Food and Nutrition Programs for Children, T.B.F. had to agree to use state meal reimbursement funds only in connection with the nonprofit's provision of meals to low-income children. To obtain state meal

3

reimbursement dollars, Defendant Williams, on behalf of T.B.F., agreed that all "reimbursement funds . . . [would be] used solely for the conduct of the food service operation, or to improve the food service operation, principally for the benefit of enrolled [children]."

10. For a nonprofit to continue receiving state meal reimbursement dollars, the nonprofit also had to submit annual management plans. In each required annual management plan, the nonprofit had to answer several questions designed to ensure that state meal reimbursement dollars were spent only in connection with the provision of meals to low-income children. For example, T.B.F. had to answer whether the organization "purchase[s] supplies, equipment, furniture, or other items with an aggregate purchase cost over $5000 in a one-year period?" In addition, T.B.F. had to detail for Missouri DHSS all of the equipment that was purchased with more than $5,000 in meal reimbursement funds every year. To continue receiving state meal reimbursement dollars, Defendant Williams represented to the State of Missouri that T.B.F. did not purchase any items over $5,000.

11. In the annual management plan, T.B.F. also had to answer the following question: "How will you ensure that all operational and administrative costs incurred are allowable and accurately reflect the operation of the program? (All costs must be included in your budget.)" To continue receiving state meal reimbursement dollars, Defendant Williams answered this question by representing to the State of Missouri that "all costs are accurately and directly related to the efficient operation of the program[.]"

## STATUTORY FRAMEWORK

12. 18 U.S.C. § 1343 (wire fraud) criminalizes devising or intending to devise a scheme to defraud (or performing specific fraudulent acts) through the use of an interstate telephone call or electronic communication.

4

13. 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering concealment) criminalizes knowing conducting a financial transaction with proceeds of a specified unlawful activity, knowing that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

14. 18 U.S.C. § 1957 (the money laundering spending statute) criminalizes knowingly engaging or attempting to engage in a monetary transaction in criminally derived property from a specified unlawful activity in an amount greater than $10,000. The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations of wire fraud (18 U.S.C. § 1343).

15. The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that, "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

16. Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C.

5

§§ 1956, 1957, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources.

17. This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could be placed beyond process if not seized by warrant.

18. Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized by a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. A civil forfeiture action may be brought in any district where "acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A). As detailed below, acts or omissions in furtherance of the fraud and money laundering scheme under investigation occurred in the Eastern District of Missouri. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. 21 U.S.C. § 853(f) provides authority for the issuance of a seizure warrant for property subject to criminal forfeiture.

19. Based on the foregoing, the issuance of this seizure warrant is authorized under 21 U.S.C. § 853(f) and 18 U.S.C. § 982(b)(1) for criminal forfeiture; and 18 U.S.C. § 981(b) and 984, and 31 U.S.C. § 5317(c)(2) for civil forfeiture. Notwithstanding the provisions of Rule 41(a) of the Federal Rules of Criminal Procedure, the issuance of this seizure warrant in this district is appropriate under 18 U.S.C. § 981(b)(3) and 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in the Eastern District of Missouri.

## **PROBABLE CAUSE**

20. Between in or about March 2020 and in or about July 2022, Defendant Williams—on behalf of T.B.F. and within the Eastern District of Missouri—submitted false and fraudulent meal reimbursement claims to Missouri DHSS. Defendant Williams submitted these false and fraudulent meal reimbursement claims so that she and Defendant Warford could take millions of dollars from Missouri's Food and Nutrition Programs for Children that they were not entitled to receive.

21. In furtherance of the fraud scheme, Defendant Williams submitted fraudulent meal reimbursement claims to Missouri DHSS for millions of meals that T.B.F. never served. Through her fraudulent reimbursement claims, Defendant Williams falsely represented that T.B.F. served a total of 2,237,337 reimbursable meals to low-income Missouri children. According to the bank records for Defendants and their entities, however, neither the Defendants, nor any of their entities, ever purchased enough food and milk to serve more than approximately one-third of the meals for which they were paid. Based on Defendant Williams' material misrepresentations in her fraudulent meal reimbursement claims, Missouri DHSS paid out nearly five million dollars that Defendants were not entitled to receive.

22. In working together to conceal the fraudulent reimbursement claims for millions of meals that T.B.F. never served, Defendant Williams and Defendant Warford created a false paper trail, making it appear as though T.B.F. purchased reimbursable meals from W.C.C. when it did not. To create the false record of fake meal purchases, Defendant Williams regularly sent payments from her T.B.F. bank account (Midwest BankCentre bank account ending in 5927) to the W.C.C. bank account (Midwest BankCentre account ending in 5875) that she controlled along with Defendant Warford. In truth and fact, Defendant Williams made those payments—not only to

reimburse W.C.C.'s minimal food purchases—but to allow herself and Defendant Warford to use public funds for their own personal expenses.

23. To further conceal Defendant Williams' fraudulent reimbursement claims for meals that T.B.F. never served, Defendants created phony monthly invoices for W.C.C. reflecting purchases of reimbursable meals that were never made. For example, Defendants created a phony W.C.C. monthly invoice for April 2021, which falsely represented that W.C.C. delivered to T.B.F 208,456 reimbursable meals, with each meal including an eight-ounce serving of milk. In reality, however, W.C.C. paid less than $5,000 on food and did not purchase a single eight-ounce serving of milk during April 2021.

24. Also as part of their scheme, Defendant Warford emailed many of the phony W.C.C. invoices to Defendant Williams in a further attempt to create a false paper trail of meal purchases that were never made by T.B.F.

13. To obtain state meal reimbursement dollars, Defendant Williams also falsely represented to Missouri DHSS (in a contract with the state) that T.B.F.'s "reimbursement funds . . . [would be] used solely for the conduct of the food service operation, or to improve the food service operation, principally for the benefit of enrolled [children]." In truth and fact, however, Defendant Williams provided over $6 million in state meal funds to W.C.C. so that she and Defendant Warford could use state meal funds for their own personal expenses. Over the course of their conspiracy, Defendant Williams wrote the following checks from her T.B.F. bank account (Midwest BankCentre bank account ending in 5927) to the W.C.C. bank account (Midwest BankCentre account ending in 5875) that she controlled along with Defendant Warford.

| Date | Check # | Memo | Amount |
| --- | --- | --- | --- |
| 06/22/2020 | 1001 | Food service/vendor | $16,000.00 |
| 06/26/2020 | 1004 | Food service | $ 44,593.00 |
| 07/17/2020 | 1023 | Food service | $ 49,537.20 |

8

| Date | Check # | Description | Amount |
|---|---|---|---|
| 08/26/2020 | 1005 | Food service/vendor | $ 40,000.00 |
| 09/01/2020 | 1008 | Food service/vendor | $ 68,000.00 |
| 09/28/2020 | 1009 | Food service | $ 17,900.00 |
| 10/20/2020 | 1012 | Food service | $ 50,000.00 |
| 10/26/2020 | 1013 | Food service | $ 9,025.50 |
| 11/16/2020 | 1016 | Vendor | $ 50,000.00 |
| 12/11/2020 | 1017 | Vendor | $ 25,000.00 |
| 12/21/2020 | 1019 | Vendor | $ 165,000.00 |
| 01/27/2021 | 1061 | Vendor Servicer | $ 300,000.00 |
| 01/27/2021 | 1062 | Vendor pay | $ 27,342.50 |
| 03/03/2021 | 1026 | Vendor/SFSP/CACFP | $ 354,638.14 |
| 04/13/2021 | 1066 | food service | $ 130,667.00 |
| 04/13/2021 | 1067 | Food Service | $ 535,986.88 |
| 04/21/2021 | 1070 | Vendor pay | $ 671,186.46 |
| 06/07/2021 | 1073 | Vendor pay | $ 572,459.06 |
| 07/08/2021 | 1074 | Vendor pay | $ 572,459.00 |
| 09/01/2021 | 2001 | June 2021 invoice | $ 498,099.94 |
| 09/01/2021 | 2004 | July inv. | $ 442,444.54 |
| 03/02/2022 | 1001 | Vendor services | $ 386,787.40 |
| 03/02/2022 | 1002 | Vendor services | $ 58,969.90 |
| 03/02/2022 | 1005 | Vendor services | $ 273,442.76 |
| 03/02/2022 | 1006 | Vendor services | $ 1,019.15 |
| 03/02/2022 | 1007 | Vendor services | $ 22,961.75 |
| 03/02/2022 | 1008 | Vendor services | $ 40,968.20 |
| 08/05/2022 | 1106 | 22001 Invoice | $ 129,733.25 |
| 09/07/2022 | 1108 | Inv 22-0003 | $ 136,029.45 |
| 09/07/2022 | 1109 | Inv 22-0004 | $ 131,946.00 |
| 10/20/2022 | 1113 | Inv 22-0005 | $ 133,881.85 |
| 12/27/2022 | 1117 | Inv 22-0002 | $ 110,612.43 |
| 08/01/2023 | 1122 | June invoice 23-006 | $ 33,038.40 |
| 09/29/2023 | 1144 | Partial Summer Food Aug. | $ 12,000.00 |
| | | **TOTAL** | **$ 6,111,729.76** |

25. Defendant Williams and Defendant Warford used the public funds—that they promised to spend on feeding low-income children—on the following personal residence and vehicles for themselves.

| Purchase Date | Property Purchased | Amount Paid |
|---|---|---|
| 3/27/2021 | Personal vehicle of Defendant Williams, 2018 Lincoln Navigator (VIN: 5LMJJ2LT2JEL02437) | $63,236.54 |
| 6/9/2021 | Personal residence of Defendant Williams and Defendant Warford, located at 8416 Rockridge, Edwardsville, IL 62025 | $1,449,000.00 |

| 11/9/2021 | Personal vehicle of Defendant Warford, 2019 Ram 1500 Rebel (VIN: 1C6SRFLT5KN784521) | $38,531.36 |
| 2/11/2022 | Personal vehicle of Defendant Williams, 2017 Chrysler Pacifica (VIN: 2C4RC1GG3HR811929) | $11,879.94 |
| | | **Total: $1,562,647.84** |

26. To further conceal Defendants' use of public meal dollars to purchase themselves a $1.44 million residence, Defendant Warford wired the purchase price of the home from Defendants' W.C.C. bank account (Midwest BankCentre account ending in 5875) to his own personal checking account (Navy Federal Credit Union bank account number ending in 0939), and then to First American Title—all within 24 hours of Defendants' home purchase.

27. To further disguise Defendants' improper, personal use of public funds, Defendant Warford falsely represented to the Internal Revenue Service that Defendants' $1.44 million home purchase, their 2018 Lincoln Navigator purchase, their 2019 Ram purchase, and their 2017 Chrysler Pacifica were all business expenses of W.C.C.

28. Defendant Williams and Defendant Warford also used state meal funds—that Defendant Williams sent from T.B.F. to W.C.C.—to spend over $140,000 on extravagant vacations for themselves, to pay over $100,000 on furniture, home electronics, and landscaping for their new residence (that was also purchased with state meal dollars), and to fund more than $50,000 in tuition payments for their children's school. On top of the millions in public meal funds that Defendants spent on themselves, Defendant Williams and Defendant Warford also provided Defendant Warford's mother with $460,320.00 in funds that they promised to spend on feeding low-income children. To disguise this improper use of public funds, Defendant Warford falsely represented to the Internal Revenue Service that the public meal fund payments to his mother were business expenses of W.C.C.

29.     In addition, Defendant Williams submitted to Missouri DHSS annual T.B.F. budgets and management plans, which included false and fraudulent representations designed to conceal Defendants' improper use of public meal funds. For example, in T.B.F.'s annual management plan that Defendant Williams submitted on or about April 5, 2021, Defendant Williams falsely and fraudulently represented that T.B.F. did not purchase any items over $5,000. But just four months prior, on or about December 22, 2020, Defendant Warford used $16,000.00 in T.B.F.'s meal reimbursement dollars—that were supposed to be spent on feeding children—to purchase a 2011 Mercedes Benz Sprinter (VIN: WD3PE7CC0B5602167). In that same management plan, Defendant Williams falsely and fraudulently represented to the State of Missouri, on behalf of T.B.F., that "all costs are accurately and directly related to the efficient operation of the program[.]" Yet, in truth and fact, Defendant Williams and Defendant Warford spent the vast majority of the meal reimbursement funds received by T.B.F. on their own personal expenses.

30.     Based on the material misrepresentations that Defendant Williams made to Missouri DHSS throughout the scheme to defraud, Missouri DHSS paid Defendants more than seven million dollars in public funds.

## PURCHASE OF TWO RAM PROMASTER VANS

31.     On January 15, 2021, TBF received a deposit into its Midwest BankCentre account from Missouri DHSS in the amount of $512,276.94. On January 27, 2021, W.C.C. deposited TBF check nos. 1061 and 1062 for $300,000 and $27,342.50, respectively, into its Midwest BankCentre account.

32.     On February 10, 2021, W.C.C. purchased two 2021 Ram Promaster vans (VINs 3C6LRVBG7ME512286 and 3C6LRVBG9ME512287) at All Star Dodge in Bridgeton, MO. The

vans were purchased for $35,181 each. W.C.C. paid for both vans utilizing cashier's check no. 153064 in the amount of $69,362 drawn from the Midwest BankCentre W.C.C. account. W.C.C. had made a $1,000 down payment to All Star Dodge using check no. 1050 from the same W.C.C. account.

33.     The vans were registered to W.C.C. at 4625 Lindell Blvd, Suite 200, St Louis, MO. The 4625 Lindell address was also the registered address for TBF. Following to the purchase of the two Promaster vans, W.C.C. contracted with Reefervan to install a refrigeration unit in one of in the Promaster vans. W.C.C. paid for this unit with a $20,000 wire to Reefervan on April 5, 2022 from its account at Midwest BankCentre.

34.     On September 24, 2021, TBF's Midwest BankCentre account received a deposit from Missouri DHSS in the amounts of $1,048,645.88. On January 31, 2022, TBF received a deposit from Missouri DHSS in the amount of $78,110.76. On March 2, 2022, W.C.C. deposited a series of six TBF checks (check nos. 1001, 1002, 1005, 1006, 1007, and 1008) totaling $784,149.16 into its account at Midwest BankCentre.

## PURCHASE OF RAM 1500

35.     On July 14, 2021 and September 24, 2021, TBF's Midwest BankCentre account received deposits from Missouri DHSS in the amounts of $1,178,006.26 and $1,048,645.88. On September 1, 2021, W.C.C. deposited TBF check nos. 2001 and 2004 for $498,099.94 and $442,444.54, respectively, in its Midwest BankCentre account.

36.     On or about November 8, 2021, WARFORD purchased a 2019 Ram 1500 Rebel (VIN 1C6SRFLT5KN784521) at GMT Auto Sales West in O'Fallon, MO. The Ram was purchased for approximately $59,106. On November 8, 2021, W.C.C. provided a $1,000 down payment with its debit card and on November 9, 2021 a $20,000 cashier's check no. 158944 both

drawn on the Midwest BankCentre W.C.C. account. The remainder of the purchase price was financed through Capital One. From December 24, 2021 through September 25, 2023, $17,531.36 in payments have been made from the Midwest BankCentre W.C.C. account to Capital One. These Capital One payments can be directly attributed to payments coming from Missouri DHSS through the Midwest BankCentre TBF account. Although purchased through the W.C.C. Midwest BankCentre account, this vehicle was registered solely in WARFORD's name.

### PURCHASE OF CHRYSLER PACIFICA

37. On September 24, 2021, TBF's Midwest BankCentre account received a deposit from Missouri DHSS in the amounts of $1,048,645.88 On January 31, 2022, TBF received a deposit from Missouri DHSS in the amount of $78,110.76. On March 2, 2022, W.C.C. deposited a series of six TBF checks (check nos. 1001, 1002, 1005, 1006, 1007, and 1008) totaling $784,149.16 into its account at Midwest BankCentre.

38. On or about February 11, 2022, WILLIAMS purchased a 2017 Chrysler Pacifica (VIN 2C4RC1GG3HR811929) at Federico Chrysler Dodge Jeep in Wood River, Illinois. The Pacifica was purchased for $31,585.00. On February 14, 2022, WILLIAMS provided a $2,500 payment with her debit card and on February 15, 2022, WILLIAMS provided a second payment with her debit card, both drawn on WILLIAMS' Navy Federal Credit Union account. The remainder of the purchase price was financed through Capital One. From March 16, 2022 through September 29, 2023, $11,879.94 in payments have been made from the Midwest BankCentre W.C.C. account to Capital One. These Capital One payments can be directly attributed to payments coming from Missouri DHSS through the Midwest BankCentre TBF account. Although purchased through the W.C.C. Midwest BankCentre account, this vehicle was registered solely in WILLIAMS' name.

13

## CONCLUSION

39. Based on the information above, there is probable cause that on or about December 18, 2020, January 15, 2021, February 19, 2021, March 18, 2021, July 14, 2021, September 24, 2021, and January 31, 2022 approximately $472,071.30, $512,276.94, $565,745.19, $624,537.16, $1,178,006.26, $1,048,645.88, and $78,110.76, respectively, of fraudulently obtained proceeds from the Missouri DHSS administered programs were deposited into The Bailey Foundation Midwest BankCentre bank account, and that a portion of these criminal proceeds were used to purchase the two Ram Promaster vans, the Ram 1500, and the Chrysler Pacifica, which are also items of property involved in the money laundering offenses. As such, I respectfully submit there is probable cause to seize the assets in Attachment A pursuant to 18 U.S.C. §§ 981(a)(1)(A) & (a)(1)(C), 982(a), and 28 U.S.C. § 2461(c).

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Craig Schneider
Special Agent
Federal Bureau of Investigation

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this __27th__ day of February, 2025.

_____
HONORABLE JOSEPH S. DUEKER
United States Magistrate Judge
Eastern District of Missouri

14

## ATTACHMENT A

A. 2021 Ram Promaster van (3C6LRVBG7ME512286)

B. 2021 Ram Promaster van (3C6LRVBG9ME512287)

C. 2019 Ram 1500 Rebel (1C6SRFLT5KN784521)

D. 2017 Chrysler Pacifica (VIN 2C4RC1GG3HR811929)